Larry REIMNITZ, Petitioner,

v.

**STATE'S ATTORNEY OF COOK COUNTY, et al., Respondents.**

No. 83 C 6451.

United States District Court, N.D. Illinois, E.D.

July 18, 1984.

Arthur J. O'Donnell, Kenneth N. Flaxman, Chicago, Ill., for petitioner.

Kevin Sweeney, Asst. State's Atty., Chicago, Ill., for respondents.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

This habeas corpus proceeding is before the court on respondent's motion to dismiss. For the reasons stated below, the court grants respondent's motion. In addition, the court denies as moot petitioner's pending motion to reconsider its order of January 17, 1984, dismissing as a respondent the Circuit Court of Cook County, Illinois.

## I.

In April 1977 petitioner Larry Reimnitz was convicted in the Circuit Court of Cook County of murdering his wife, Linda Reimnitz. She had been found strangled on January 16, 1975. Central to the State's case against Reimnitz was a transcribed inculpatory statement which he gave on August 25, 1975. Reimnitz moved unsuccessfully for the suppression of this statement (and of untranscribed statements given the same day), and on appeal from his conviction he argued that it was error not to suppress the statement. Reimnitz also argued on appeal that it was error to admit evidence of a homosexual act which Reimnitz performed upon a sleeping, unconsenting friend, in early August 1975, seven months after his wife's death (hereinafter the "Silver Lake" incident). The Illinois Appellate Court reversed Reimnitz's conviction, holding that evidence of the Silver Lake incident should not have been admitted, since it had a prejudicial effect outweighing its probative value. *People v. Reimnitz*, 72 Ill.App.3d 761, 29 Ill.Dec. 117, 391 N.E.2d 380 (1st Dist.1979).

■ On remand, before a new trial judge, Reimnitz moved for dismissal, arguing that the Double Jeopardy Clause barred retrial. The general rule, of course, is that the Double Jeopardy Clause does not bar retrial of a defendant who successfully has appealed and obtained reversal of a conviction. *Tibbs v. Florida*, 457 U.S. 31, 39–40, 102 S.Ct. 2211, 2217, 72 L.Ed.2d 652. Reimnitz raised two arguments to avoid this general rule, one based on the introduction of evidence of the Silver Lake incident, and the other based on the introduction of his inculpatory statement. The trial court granted Reimnitz's motion to dismiss, accepting his argument based on evidence of the Silver Lake incident. The Illinois Appellate Court reversed, addressing and rejecting both of Reimnitz's arguments, and remanding for retrial. *People v. Reimnitz*, 97 Ill.App.3d 946, 53 Ill.Dec. 265, 423 N.E.2d 934 (1st Dist.), *cert. denied*, 456 U.S. 906, 102 S.Ct. 1751, 72 L.Ed.2d 162 (1982).

■ Reimnitz now has petitioned this court for habeas corpus relief, raising both of the double jeopardy arguments he raised in the state courts. Reimnitz's petition alleges that he is free on bail awaiting retrial. (Petition, ¶ 1.) He thus is subject to the conditions of Ill.Stat.Ann. ch. 38, ¶ 110–10(a) (Smith-Hurd Supp. 1983–84), and it seems clear that he must be deemed to be in "custody," as is necessary to support jurisdiction under 28 U.S.C. § 2241(c)(3). *See Justices of Boston Municipal Court v. Lydon*, —— U.S. ——, —— – ——, 104 S.Ct. 1805, 1809–10, 80 L.Ed.2d 311 (1984). It also appears that Reimnitz's petition is subject to the requirements of 28 U.S.C. § 2254, which apply to petitions brought by persons in custody pursuant to the judgment of a state court. *Id.* at 1810 & n. 3. The court already has held that Reimnitz has satisfied the exhaustion requirement of § 2254(b). (Memorandum Opinion and Order of 1/17/84.) The State voluntarily has delayed Reimnitz's retrial, pending the outcome of this proceeding.

The record before the court has been supplemented to the extent requested by Reimnitz. (See Reimnitz memo filed 3/5/84, p. 2.) On January 23, 1984, with Reimnitz's agreement, the c᷉urt excused respondents from filing a transcript of Reimnitz's trial and suppression hearing, and allowed respondents to file instead the abstract prepared by Reimnitz for use on direct appeal from his conviction. The parties have not discussed by what standards the court should decide respondents' motion to dismiss, but the court believes that the motion must be granted even by summary judgment standards; the record before the court indicates that there is no genuine issue as to any material fact.

## II.

Reimnitz argues that introduction of evidence of the Silver Lake incident was prosecutorial misconduct or overreaching, barring retrial after reversal on appeal. The court believes that Reimnitz's argument is insufficient as a matter of law, and the court also believes that the record does not

reveal any prosecutorial misconduct or overreaching.

The question raised by Reimnitz usually arises in the context of an attempt to retry a defendant who successfully has moved for a mistrial. In *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the Supreme Court found its prior decisions to be somewhat in disarray, and to clarify this area of law the Court held:

> Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. A defendant's motion for a mistrial constitutes "a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." *United States v. Scott,* 437 U.S. 82, 93, 98 S.Ct. 2187, 2195, 57 L.Ed.2d 65 (1978). Where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error." *United States v. Dinitz, supra,* 424 U.S., [600] at 609, 96 S.Ct., [1075] at 1080 [47 L.Ed.2d 267]. Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of Double Jeopardy to a second trial after having succeeded in aborting the first on his own motion.

*Id.* at 675–76, 102 S.Ct. at 2089.[1]

■ The rule stated in *Oregon v. Kennedy* is an exception to the general rule that a defendant may be retried after successfully moving for a mistrial. It is not at all clear that there is any comparable exception to the general rule that a defendant may be retried after obtaining reversal of a conviction on appeal. Although the question was not before the Court in *Oregon v. Kennedy,* the Court seems clearly to have assumed that the Double Jeopardy Clause does not bar retrial after appellate reversal of a conviction is caused by prosecutorial misconduct, despite some possible encroachment on the defendant's double jeopardy rights. 456 U.S. at 676, 102 S.Ct. at 2089. Respondents have cited *Gully v. Kunzman,* 592 F.2d 283 (6th Cir.), *cert. denied,* 442 U.S. 924, 99 S.Ct. 2850, 61 L.Ed.2d 292 (1979), in which the Court stated:

> [Defendant] argues that the State should be barred from retrying him because its own misconduct led to the reversal of his first conviction. Even accepting that characterization of the trial error which caused the appellate reversal, it would not affect the State's right to retry him.... His attempt to analogize his situation to cases where retrial has followed a mistrial provoked by prosecutorial misconduct is unavailing. In such cases, retrial is disapproved principally because the misconduct resulting in a mistrial has deprived the defendant of "[the] valued right to have his trial completed by a particular tribunal." ... [Defendant's] first trial proceeded all the way to verdict, and, consequently, he fully enjoyed that right.

*Id.* at 289–90. It seems to the court that the reasoning of *Oregon v. Kennedy* might in fact have some application to the question of retrial after reversal of a conviction. A review of the record demonstrates, however, that this case could not fall within any such exception, if there is one, to the general rule that the Double Jeopardy Clause does not bar retrial after a defendant obtains appellate reversal of his conviction.

As noted above, Reimnitz's inculpatory statement of August 25, 1975, was an im-

---

1. Reimnitz argues that *Oregon v. Kennedy* "should not be read as having limited the Double Jeopardy protections against prosecutorial overreaching to the 'goading' situation." (Reimnitz memo filed 6/4/84, p. 9 n. 3.) The court cannot agree with Reimnitz's contention, which is based on a misreading of a Supreme Court footnote. 456 U.S. at 678 n. 8, 102 S.Ct. at 2090 n. 8. *See also United States ex rel. Clauser v. McCevers,* 731 F.2d 423, 431 n. 6, (7th Cir.1984).

portant part of the State's case. Reimnitz's statement is rather elliptical, especially on some important points. The double-spaced transcript, which includes both Reimnitz's answers and the questions put to him by his interrogators, is only about seven pages long. The central passage reads as follows:

"Q. Directing your attention to the dinner hour, did you have occasion to have dinner with your wife on that date?

A Yes.

Q And shortly after dinner what if anything did you have occasion to do?

A I went to the den to make out a bank deposit.

Q For what purpose?

A I had a couple of checks we were going to deposit.

Q While you were in the den was there a desk in the den?

A Yes.

Q While you were in the den what if anything occurred?

A I called Linda in to endorse the checks and she said she wanted $20.00 and we were talking a little bit and she put her arms around me.

Q Where was she in relationship to you then?

A She was sitting on the desk and then behind me. I was in the desk chair.

Q So, she came up behind you and what did she do?

A She kissed my ear.

Q When you felt her kiss your ear did anything else happen?

A She put her arms around my neck.

Q Anything else? Did you feel the softness of her fur coat?

A Yes.

Q Did she say anything to you at the time?

A No, I don't remember her saying anything.

Q Did you say anything to her?

A I don't remember saying anything to her either. We sat down on the floor, you know, hugging and kissing and fooling around.

Q Was that prelude, possibly to a sexual act?

A Yes, I remember pushing against her with my head and after a while I had to go to choir.

Q Prior to that did she bump her head?

A No.

Q All right, before going to choir what did you do?

A She wanted to make love and I didn't want to and I told her and the next thing I remember she was saying, No, your career and your job; and, she was on top of me.

Q Where were your hands at?

A I'm not sure, but next I was on top of her and I had my hand on her mouth.

Q And, did you say anything to her?

A I didn't say anything to her, be quiet—

Q Be quiet?

A Yes.

Q And you had your hand on her mouth?

A Yes.

Q Did you have your hands on her throat?

A I had them on her hands once.

Q When you say you had your hands on her hands, what do you mean by that, that you were holding them?

A I remember my hands were holding hers and on her face, and she said, No, your career and your job, and I noticed her eyes were shut.

Q That is when you were on top of her?

A Yes.

Q And you had your hand on her throat?

MR. WALDRON: Do you recall, Larry, applying pressure with your hands?

A (nods)

MR. WALDRON: Squeesing [sic] hard, like you said before?

A I remember on her face I was pushing quite hard.

MR. WALDRON: You were pushing hard?

A Yes.

MR. JOHNSON: Then you noticed that her eyes were closed?

A Yes. I called her name.

MR. JOHNSON: What did you say?

A Linda, I'm sorry, I have to go to choir and she didn't wake up and I was going to take her to the hospital and I picked her up and—

MR. JOHNSON: Where was her purse at this time?

A It was on the floor and I laid it on top of her.

Q What did you do with her?

A I picked her up and carried her outside?

MR. WALDRON: Which way did you go outside?

A Out the back door.

MR. JOHNSON: All right, what happened as you were carrying her out the back door?

A One of her shoes came off and her ear-ring caught on the door handle. I almost dropped her on the way to the car but I opened the door and laid her in the car and I put her in the back seat and she fell down and I got her back up on the seat again and then I went back to the house and got her shoe and her ear ring and my coat and I put the shoe in with her.

Q You laid the shoe next to her purse?

A Yes.

Q What did you do with the ear ring?

A I threw it in the car and I closed the door of the car; and, then I ran off to choir and when I got there there was a few people waiting."

(Statement of 8/25/75, pp. 6–10.)

Without any factual context, Reimnitz's statement is subject to attack as simply unconvincing. In presenting its case the state attempted to provide a context against which Reimnitz's account of his behavior would make sense and be believable. The Silver Lake incident, as the prosecution apparently viewed it, could be combined with other facts to make a jury believe that Reimnitz could have strangled his wife in response to her attempt to initiate sex. In addition, the State's evidence suggested a connection between the Silver Lake incident and Reimnitz's willingness to confess to murdering his wife. In this respect the incident might supply a jury with an explanation for the giving of an inculpatory statement seven months after the crime.

Starting in the autumn of 1971, Reimnitz was a teacher in a parochial school. A year later he met Linda Wunderlich, the daughter of the school's principal. They became engaged at Christmas 1973, and they were married on August 4, 1974. (A. 255–56.) While married, Reimnitz continued his close friendship with a young man named David, who later was Reimnitz's victim in the Silver Lake incident. David had been in Reimnitz's eighth-grade class the first year Reimnitz taught at the school, and they socialized frequently thereafter. After Reimnitz's marriage, Reimnitz and David would visit as frequently as every other evening. (Statement of 1/22/75, pp. 14–15.) Reimnitz has given mildly conflicting statements as to whether his wife objected to his friendship with David, or to the frequency of his visits. It appears that she did voice some objections. (Statement of 1/22/75, pp. 15–16, 34–35; A. 281.) David was visiting Reimnitz on January 16, 1975, when they found Linda's body in the Reimnitz's car, which was in their garage. (E.G., A. 151.)

Police investigators suspected Reimnitz, and they quickly developed an interest in his relationship with David. In a 75-page exculpatory statement given January 22, 1975, Reimnitz is asked several questions aimed at determining whether he had a homosexual relationship with David, or whether Linda had thought so. (Statement

of 1/22/75, pp. 15–16, 35, 69–70.) Reimnitz denied ever having had any sexual contact with David. (Statement of 1/22/75, pp. 15–16.) In response to the question whether Reimnitz had ever engaged in any homosexual activity, Reimnitz answered, "No, the only time I came close was when [my college] room mate tried something." (Statement of 1/22/75, pp. 16–17.) Although Reimnitz denied killing his wife, investigators continued to suspect him.

Almost seven months later, in early August 1975, Reimnitz accompanied David and others, mostly members of David's family, to a cabin on Silver Lake, Indiana, owned by David's parents. At one point the others returned home, and only Reimnitz and David remained in the cabin. During the night Reimnitz awakened and performed a sex act upon David, who awakened during the act. (A. 295–96, 352.) David became upset and yelled at Reimnitz; Reimnitz lay face down on his bed, and then he turned, said he didn't know why he had done it, and referred to the incident with his college roommate. (A. 353.)

About two weeks later, on August 24 or 25, 1975, Reimnitz wrote a letter to David, asking his forgiveness. (A. 292–95.) On August 24, 1975, investigators visited Reimnitz's home, asked if he would answer some questions concerning his wife's death, and asked if he would come to the police station to discuss the lighting in some police photos. Reimnitz said that he would come to the station the next day, and he did so. (A. 31–33.) The next day, August 25, 1975, Reimnitz went to the police station at about 3:00 p.m. (A. 64.) At about 4:00 p.m. Reimnitz said, "I don't know whether you know it or not, but I suppose I should tell you what happened a few weeks ago in Indiana with David." (A. 34.) Reimnitz described the incident, and an investigator asked Reimnitz why he thought the incident happened. Reimnitz answered, "I don't know why I did it. Everyone said I killed Linda, and they said I did it because I was a homosexual. Maybe that's why I did it to David." (A. 49.) Several hours later, Reimnitz gave the inculpatory statement of August 25, 1975.

Evidence of the Silver Lake incident was placed before the jury in the following ways. During the State's case-in-chief, investigators Robert Cadieux and William Waldron described Reimnitz's visit to the police station on August 25, 1975. In the course of their testimony, they both reported that Reimnitz had volunteered his account of the incident, and they both repeated his description of the incident. (A. 198–200, 210–212.) During the defense case, the State cross-examined Reimnitz and elicited a description of the incident. (A. 295–96.) Reimnitz stated that he had manually masturbated David, and when questioned he denied any oral contact. (A. 296–97.) This testimony was consistent with the description of the incident which he gave to police investigators on August 25, 1975. (A. 200, 212.) The State called David as a rebuttal witness, and he described the incident. David testified that he awakened to find Reimnitz performing an act of oral sex upon him, and he also reported Reimnitz's comment concerning the incident with his college roommate. (A. 352–53.) In addition, the State attempted to introduce rebuttal evidence to the effect that Linda Reimnitz had complained to a friend that Reimnitz generally was not active sexually, and that he would not respond to her advances. The court excluded this evidence on hearsay grounds. (A. 348–50.)

Reimnitz's argument relating to evidence of the homosexual incident is found primarily in his memorandum filed June 4, 1984. The first prong of Reimnitz's argument is that the evidence clearly was inadmissible, and was known by the State to be inadmissible. The Illinois Appellate Court held that the evidence should not have been admitted, because its probative value was outweighed by its prejudicial effect. 72 Ill.App.3d at 762–63, 29 Ill.Dec. at 117–118, 391 N.E.2d at 381–82. There is no reason for the court to attempt to reevaluate the ruling of the Illinois Appellate Court, but it is appropriate for the court to consider whether the State plausibly could have be-

lieved that the evidence might be admissible. The court concludes that the State plausibly could have believed that the evidence was admissible.

As noted above, Reimnitz's volunteered description of the Silver Lake incident at the police station on August 25, 1975, had some value in explaining why Reimnitz would give an inculpatory statement seven months after his wife's death. The State argued along these lines in opposing Reimnitz's post-trial motions:

> As I argued to the jury, Judge, and I still believe the officers caught themselves a break which they didn't even realize they had on that Sunday when they first presented themselves at the Defendant's house, the same day the Defendant had written that letter to David ... apologizing for what he had done to David .... The Defendant was in a remorseful mood that Sunday night. The officers didn't know that.

> I suggest to the Court, as I did to the Jury, that when Reimnitz saw those officers standing at his house on Sunday, he thought that David ... had blown the whistle on him and that is why Cadieux and Waldron were there.

> In any event, Judge, on Monday he opens up to the officers. Officers, I suppose you're going to ask me about what happened at the lake. The officers, not knowing anything about it, say well tell us, Larry, what are you talking about. Then he tells them about what happened.

> We have a right to put those statements in, the credibility, the voluntariness of that statement. Then they have a right to hear the whole statement and

part of the statement is the Defendant's admission of other kinds of acts that probably would be better off left unsaid if a man was trying to fabricate a story throughout that day. The Defendant was beginning to go through his truthtelling and part of that truthtelling involved his telling us of his actions with David.

(Transcript of 5/11/77, pp. 2507–09.) [2]

It also was reasonable for the State to view the Silver Lake incident itself as having some probative value.[3] Reimnitz's statement of August 20, 1975, was sketchy. It suggested that he strangled his wife in response to her attempt to initiate lovemaking. The State quite reasonably perceived that the credibility of Reimnitz's statement might depend on the State's ability to provide the jury with some explanation for such behavior. The Silver Lake incident plausibly could be seen as holding the key. A homosexual orientation could account for Reimnitz's negative reaction to his wife's attentions, and it also could suggest that the subject of marital sex was a stressful one for Reimnitz and, possibly, for his wife. As the Illinois Appellate Court noted, it is questionable whether the single Silver Lake incident could establish that Reimnitz had a homosexual preference seven months earlier, at the time of his wife's death. 72 Ill.App.3d at 762–63, 29 Ill.Dec. 117, 391 N.E.2d at 381. On the other hand, even a preoccupation with David, as opposed to a general homosexual preference, might carry some probative value, since David was a frequent visitor to the Reimnitz home in January 1975. It was not unreasonable for the State to attempt to bring

---

**2.** Spangler later gave testimony suggesting that the police officers did know of the Silver Lake incident when they visited Reimnitz on August 24, 1975. (Transcript of 11/16/82, pp. 11–14.)

**3.** In its case-in-chief the State apparently proceeded only upon the theory that Reimnitz's disclosure of the Silver Lake incident was relevant to the voluntariness and credibility of his inculpatory statement. Only evidence of Reimnitz's disclosure of the incident, and not any direct evidence of the incident itself, was introduced in the case-in-chief. The State believed that Reimnitz's testimony justified cross-exami-

nation as to the incident, as well as rebuttal evidence. (See transcript of 5/20/77, pp. 25007–16.) Before this court both Reimnitz and respondents have argued the issues as though all the evidence came in during the State's case-in-chief, paying no particular attention to the separate arguments which might be made as to the cross-examination and the rebuttal evidence, such as whether it was reasonable to impeach Reimnitz with David's testimony that it was an oral, rather than a manual, act. The court analyzes the case as the parties have analyzed it.

the Silver Lake incident before the jury. The State may have overstated its case somewhat by arguing that the Silver Lake incident tended to establish a "motive" for Reimnitz to murder his wife. (*E.g.*, A. 358.) Further, some of the State's argument at trial and on appeal referred crassly to the Silver Lake evidence. These factors are insufficient to cast doubt on the State's appraisal of the Silver Lake evidence.

As a general matter, the State should be free to pursue its theories vigorously, leaving it to the trial judge to weigh the probative value of its evidence against any prejudicial effect it might have. The second prong of Reimnitz's argument responds to this obvious objection by arguing that the State misled the trial judge in order to have the evidence admitted, in effect usurping the judicial role. The court is not persuaded by this argument.

After investigators Cadieux and Waldron testified as to Reimnitz's disclosure of the Silver Lake incident, the trial judge indicated to counsel that he was relying on the State to connect this evidence up. (A. 220.)[4] It appears that the State did not articulate its theory until after the close of its rebuttal case. (A. 357–58.) Reimnitz argues primarily that the State induced the trial judge to believe that the State would present evidence of an ongoing homosexual relationship between Reimnitz and David, while the State knew all along that it had evidence only of the Silver Lake incident and of the incident with Reimnitz's college roommate. (Reimnitz memo filed 6/4/84, pp. 4, 6–7.) This theory seems to have motivated much of Reimnitz's questioning of witnesses during the state court evidentiary hearings on Reimnitz's double jeopardy motion. (Transcripts of 11/16/81 & 11/23/81.) The court does not find any support for this theory in the record before it. There is no indication that the State represented (or that the trial judge believed) that the evidence would be connected up by proof of an ongoing homosexual relationship, as opposed to some other type of connecting evidence. It bears pointing out that the trial judge never expressed any surprise or disappointment when the State finally articulated its theory; rather, the judge accepted it. This is not a case in which the trial judge felt he had been abused but ultimately decided against granting a mistrial. Instead, the judge agreed that the evidence properly was admitted, and he explained his reasoning on the record. (Transcript of 5/20/77, pp. 2519–21.)

The court thus rejects the factual predicate of Reimnitz's argument. The record before the court simply will not support it. Further, the court also rejects the third prong of Reimnitz's argument, in which he attempts to bring his construction of the facts within the rule stated in *Oregon v. Kennedy*. The underlying basis for the rule in *Oregon v. Kennedy* is the circumstance that retrial generally is not permitted if the prosecution successfully moves for a mistrial over the defendant's objection, but that retrial generally is permitted if the defendant successfully moves for a mistrial over the prosecution's objection. 456 U.S. at 671–73, 102 S.Ct. at 2087–2088. Because of this assymetry, a prosecutor who feels a case slipping away, or who desires a mistrial for some other reason, has an incentive to goad the defendant into moving for the mistrial which the prosecutor desires. *See id.* at 686 n. 19, 102 S.Ct. at 2095 n. 19, (Stevens, J., concurring). *Oregon v. Kennedy* seeks to remove that incentive by holding that retrial is barred when a prosecutor resorts to this tactic.

As noted above, *Oregon v. Kennedy* seems to assume that its holding will have no application where the defendant obtains appellate reversal of a conviction, instead of a mistrial. 456 U.S. at 676, 102 S.Ct. at

---

**4.** Reimnitz also cites to A. 306 for the proposition that the trial judge admitted the evidence on the assumption that the State would connect it up. The Abstract does not support that characterization. The trial judge was concerned with whether the State could prove its basis for asking Reimnitz about oral-genital contact, not with the relevance of such evidence. The trial judge's subsequent recollection of the exchange did, however, match Reimnitz's characterization. (Transcript of 5/20/77, pp. 2512–13.)

2089. It is conceivable that *Oregon v. Kennedy* should apply to bar retrial in the unlikely event that a prosecutor intentionally goads a defendant into moving for a mistrial but the mistrial is denied by the trial court. The appellate court presumably would reverse any ensuing conviction, and perhaps retrial should be barred in such circumstances. It is not Reimnitz's theory, however, that the State attempted to goad him into moving for a mistrial. Instead, he argues that the State knew that the evidence in question clearly was inadmissible, and "that the prosecutor lured the trial judge into permitting admission of testimony about the homosexual episodes in order to secure a conviction in a case which otherwise would likely have resulted in an acquittal." (Reimnitz memo filed 6/4/84, p. 13.) The court does not believe that this theory is consistent with the reasoning of *Oregon v. Kennedy,* and the court therefore rejects Reimnitz's argument as legally deficient, just as the court has concluded that its factual predicate is not supported by the record.

■ Reimnitz's argument based on the Silver Lake incident raises two additional issues which deserve attention, one relating to waiver and one relating to state court findings of fact. The court previously has suggested that Reimnitz might be deemed to have waived his claim to the extent it is based on matters brought out at the state court evidentiary hearings on Reimnitz's double jeopardy motion. (Memorandum Opinion and Order of 1/17/84, p. 6.) After the first appeal, Reimnitz presented his double jeopardy argument to the state trial court, which granted his motion, and then to the Illinois Appellate Court, which reversed and remanded for trial. Reimnitz then renewed his motion and presented evidence concerning the prosecutor's introduction of the Silver Lake evidence, after which the trial court denied his renewed motion. From this denial of his renewed motion Reimnitz did not appeal, as he apparently could have done under Ill.Stat. Ann. ch. 110A, ¶ 604(f) (Smith-Hurd 1983); instead, he petitioned (unsuccessfully) for leave to file a mandamus action in the Illinois Supreme Court. (Petition, ¶¶ 9, 10.) These facts arguably indicate waiver of arguments based on the evidence presented after remand from the second appeal. *United States ex rel. Spurlark v. Wolff,* 699 F.2d 354 (7th Cir.1983) (en banc). Ordinarily, the court should decide a waiver question before deciding the merits of a claim, but in this case the evidentiary hearings held after the second appeal are of only marginal importance to the court's analysis, and the court will not address the difficult waiver question presented by these facts. When the court suggested the waiver issue it had not yet seen a transcript of the November 23, 1982 hearing, so the court did not know whether the waiver issue would be significant.

■ On the second appeal the Illinois Appellate Court stated that: "We simply find that there is no showing of deliberate misconduct on the part of the prosecutor calculated to deprive defendant of a fair trial." 97 Ill.App.3d at 948, 53 Ill.Dec. at 267, 423 N.E.2d at 936. Respondent argues that the court should accord this statement a presumption of correctness. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); 28 U.S.C. § 2254(d). Reimnitz responds that the quoted statement reflects only determination of a mixed question of fact and law, and thus is not entitled to a presumption of correctness. *United States ex rel. Rivers v. Franzen,* 692 F.2d 491, 497 (7th Cir. 1982). The court agrees with Reimnitz on this point. Further, the Illinois Appellate Court, writing before *Oregon v. Kennedy,* was not applying precisely the same legal standard as this court has applied. As it turns out, this court agrees with the conclusion of the Illinois Appellate Court.

### III.

Reimnitz's other argument is based on the inculpatory statement he gave on August 25, 1975. Before trial Reimnitz moved to suppress his statement, asserting *inter alia* that the statement was induced by promises of leniency. The trial judge

conducted an extended hearing, at the close of which he denied Reimnitz's motion. (A. 29–150.) The State introduced the statement into evidence, and Reimnitz was convicted. On direct appeal from his conviction, Reimnitz argued that it was error to admit the statement. The Illinois Appellate Court reversed Reimnitz's conviction on the basis of his other argument, that it was error to admit evidence of the Silver Lake incident. In the closing paragraph of its opinion, the court commented on Reimnitz's statement:

> Because reference to Reimnitz's homosexual act should not have been admitted, we reverse his conviction and remand this cause for a new trial. In so doing, we refrain from passing upon whether Reimnitz's confession was voluntary and therefore properly admitted at his trial. Further proceedings in this case may bring forth additional evidence bearing on this issue. For example, the State did not respond to Reimnitz's testimony that the deputy sheriffs who received his confession made implied promises of benefits and leniency to induce him to confess. We therefore believe that consideration of the admissibility of the confession would be premature at this time. The propriety of admitting the confession should be left open to be considered with such additional evidence as the prosecutor and the defendant may present on remand.

72 Ill.App.3d at 764, 29 Ill.Dec. at 119, 391 N.E.2d at 382.

On remand, Reimnitz argued that retrial was barred, because of the State's misconduct in introducing evidence of the Silver Lake incident. The trial court agreed and dismissed the indictment. The State appealed, and the Illinois Appellate Court reversed. As an alternative basis for affirming the dismissal of the indictment, Reimnitz argued that his inculpatory statement was involuntary, that it had been found to be involuntary on the first appeal, and that the evidence apart from his inculpatory statement was insufficient to convict him; Reimnitz argued that these factors combined to bar retrial. Addressing this argument, the court stated:

> We find no merit in defendant's additional argument, not reached by Judge Cousins, that a statement contained in this court's earlier opinion regarding defendant's confession is a separate and distinct double jeopardy ground for not permitting retrial.

97 Ill.App.3d at 948, 53 Ill.Dec. at 267, 423 N.E.2d at 936. The court quoted the passage from its prior opinion that this court has quoted above, and then continued:

> Despite this court's refusal to consider whether defendant's confession was voluntary and thus properly received in evidence, defendant maintains that the foregoing dicta amounts to a finding that the confession was improperly admitted. We think not, and we also believe that this court's unwillingness to consider the voluntariness of the confession has no effect upon the State's right to retry defendant following reversal and remand. Along with the interest of a defendant in receiving a fair trial is the corresponding interest of the People in securing the convictions of those guilty of criminal offenses. *United States v. Tateo* (1964), 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448.

*Id.* at 948–49, 53 Ill.Dec. at 267, 423 N.E.2d at 936.

Reimnitz asks the court to bar the State from retrying him, or alternatively, to bar the State from introducing his inculpatory statement should it retry him. As discussed below, the court holds that Reimnitz is not entitled to such relief, even if he is correct in asserting that his inculpatory statement was not given voluntarily. Accordingly, the court rejects Reimnitz's argument without deciding the voluntariness of his statement.

■ Most of Reimnitz's legal discussion of this issue is directed to two points. First, Reimnitz argues that his statement was not given voluntarily, and second, he argues that exhaustion requirements and principles of comity are satisfied, making it proper for the court to consider whether

his statement was voluntary. These two points, without more, do not amount to a claim which is cognizable in this proceeding. Justice O'Connor recently has explained:

Federal habeas jurisdiction plainly does not attach merely because a state criminal defendant, whose freedom to come and go as he pleases is limited in some way in connection with a criminal proceeding, has exhausted state interlocutory review of a particular federal claim. Federal habeas jurisdiction is absent because "custody" in connection with an ongoing trial is usually not "in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. §§ 2241(c)(3), 2254(a), even when the proceedings themselves or the underlying charge are constitutionally defective. Most constitutional rights exist to protect a criminal defendant from *conviction* —not from the process of trial itself.

*Justices of Boston Municipal Court v. Lydon,* —— U.S. ——, 104 S.Ct. 1805, 1829, 80 L.Ed.2d 311 (1984) (opinion of O'Connor, J.; emphasis in original). Pre-trial habeas corpus relief is available only when, contrary to the general rule, the process of trial itself would violate a defendant's constitutional rights. This is not true of claims based on illegally obtained confessions, but claims based on the Double Jeopardy Clause generally do present such a situation. Justice O'Connor continued:

In this regard, however, I agree with the Court that double jeopardy is different. Here, custody incident to a trial may violate the Constitution because the trial itself, regardless of its outcome, is unconstitutional. For this reason I agree that a prisoner who is incarcerated in connection with a criminal proceeding is "in custody in violation of the Constitution," 28 U.S.C. § 2254(a), when the proceeding violates his double jeopardy rights. Cf. *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).

*Id.*[5]

Reimnitz's claim ostensibly is based on the Double Jeopardy Clause, but his memoranda of law do not devote much attention to the task of bringing his claim, which essentially is based on the asserted involuntariness of his inculpatory statement, within the scope of the Double Jeopardy Clause. Reimnitz is not, however, silent on this point. Two clear themes can be found in his memoranda. One theme is based on the premise that the Illinois Appellate Court has not ruled upon the voluntariness of Reimnitz's statement, despite his pressing the question on two appeals. The other theme in Reimnitz's memoranda is based on an alternative premise, that the Illinois Appellate Court did, in effect, determine on the first appeal that Reimnitz's statement was not given voluntarily.

▮▮▮ Arguing that the Illinois Appellate Court has not passed on the voluntariness of his statement, Reimnitz states:

absent relief from this Court, petitioner must run the gauntlet of a trial for the second time before an Illinois reviewing court will assess the voluntariness of statements secured by promises of benefits and leniency. This result should not be permitted, especially when—but for the statements—the evidence available to the prosecution is insufficient to establish guilt.

(Reimnitz memo filed 3/5/84, p. 24.) This argument must be rejected. The Double Jeopardy Clause does not guarantee that an appellate court, in reversing a conviction and remanding for a new trial, will rule on all evidentiary objections—as distinct from claims of insufficiency of evidence—raised by the defendant-appellant, even if those objections are constitutional in nature. *Cf. Delk v. Atkinson,* 665 F.2d 90, 93 n. 1 (6th Cir.1981) (citing cases which hold that appellate courts must decide claim of insufficiency of evidence before remanding for

---

**5.** Double jeopardy rights are not unique in this respect. *E.g., United States v. Claiborne,* 727 F.2d 842, 844 (9th Cir.1984).

new trial). Nor is Reimnitz's argument aided by the assertion that "but for the statements ... the evidence available to the prosecution is insufficient to establish guilt." When an appellate court reverses a conviction because of the improper admission of evidence, the Double Jeopardy Clause does not require it to assess the sufficiency of the remaining evidence. *United States v. Key*, 725 F.2d 1123, 1127 (7th Cir.1984). Even if the appellate court does make such an assessment, and does determine that the remaining evidence is insufficient, the Double Jeopardy Clause still does not bar retrial. *United States v. Tranowski*, 702 F.2d 668, 671 (7th Cir. 1983). Reimnitz does not argue that *all* the evidence admitted at trial was insufficient to establish guilt, as would preclude retrial under *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 214, 57 L.Ed.2d 1 (1978).

Reimnitz's other line of argument is based on the premise that the Illinois Appellate Court did in effect decide that his statement was given involuntarily. (Reimnitz memo filed 3/5/84, pp. 23–24.) Although Reimnitz does not explain clearly why such a premise would implicate his double jeopardy rights, it is not difficult to extrapolate his argument. If the Illinois Appellate Court entered a judgment determining that Reimnitz's statement was not given voluntarily, then collateral estoppel, or something akin to it, would preclude the trial court on remand from finding that the statement was given voluntarily. *Cf. People v. Williams*, 59 Ill.2d 557, 322 N.E.2d 461 (1975) (defendant's successful motion to suppress given collateral estoppel effect in subsequent prosecution for a separate crime). The Double Jeopardy Clause includes a collateral estoppel component, and failure to apply collateral estoppel where appropriate can violate a defendant's double jeopardy rights. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

 There are several reasons why this argument, or any similar argument, should be rejected. First of all, the court rejects Reimnitz's factual predicate; the court does not believe that the Illinois Appellate Court determined the voluntariness of Reimnitz's statement on the first appeal. Second, it is not clear that the term collateral estoppel appropriately describes the preclusive effect to be given to the judgment of an appellate court by the trial court on remand. More likely, the appropriate concept is the doctrine of the law of the case. *Cf. United States v. Maybusher*, 435 F.2d 366 (9th Cir.1984) (refusing to suppress evidence under law of the case doctrine, because defendant-appellant had not been party to earlier appeal on which evidence had been ordered suppressed as to other defendants). While it is established that the Double Jeopardy Clause has a collateral estoppel component, it is not established that the law of the case doctrine is a part of the Double Jeopardy Clause. The principle of continuing jeopardy may distinguish collateral estoppel from the law of the case for double jeopardy purposes. *See Richardson v. United States*, — U.S. —, —, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242, (1984); *Price v. Georgia*, 398 U.S. 323, 329, 90 S.Ct. 1757, 1761, 26 L.Ed.2d 300 (1970).

 Even if Reimnitz's argument managed to clear these hurdles, however, a very persuasive line of cases suggests a reason why Reimnitz should not be entitled to pre-trial habeas corpus relief. This line of cases distinguishes, for purposes of interlocutory review, between cases in which the claimed collateral estoppel would preclude proof of an essential element of the crime, thus barring a prosecution in its entirety, and cases in which the claimed collateral estoppel merely would restrict the prosecution's proof or preclude nonessential issues. *E.g.*, *United States v. Head*, 697 F.2d 1200 (4th Cir.1982) *cert. denied*, — U.S. —, 103 S.Ct. 3113, 77 L.Ed.2d 1367 (1983); *United States v. Powell*, 632 F.2d 754, 758 (9th Cir.1980); *United States v. Mock*, 604 F.2d 336, 338–40 (5th Cir.1979). These cases and those following them, arise in a procedural context different from that presented here. These cases all involve interlocutory appeals from

pending federal criminal prosecutions; the issue they consider is the existence of appellate jurisdiction under 28 U.S.C. § 1291. Although § 1291 allows appeals only from final judgments, an exception or modification was created for "collateral" orders. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). In criminal proceedings, the collateral order exception is held to allow interlocutory appeals from pre-trial rulings denying motions to dismiss on double jeopardy grounds. *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). In *Ashe v. Swenson*, as noted above, the Supreme Court held that the Double Jeopardy Clause carries a collateral estoppel component. 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469. Long before the constitutional ruling in *Ashe v. Swenson*, federal criminal law had recognized the doctrine of collateral estoppel. *E.g., United States v. Oppenheimer*, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916).[6] It does not appear that pre-trial collateral estoppel rulings historically were appealable immediately, but *Ashe v. Swenson* and *Abney* combined to give federal criminal defendants a basis for arguing that they were entitled, under the Double Jeopardy Clause, to immediate appeal of any ruling denying a collateral estoppel claim. To avoid this unintended result, *Mock, Powell*, and *Head* distinguished between cases in which the claimed collateral estoppel would bar an entire prosecution and cases in which the claimed collateral estoppel mere-

ly would restrict the Government's proof or preclude nonessential issues. In the former cases an immediate appeal will lie under the collateral order exception, and in the latter cases an immediate appeal will not lie.

■ *Head's* rationale for this distinction has obvious application to Reimnitz's claim. *Head* holds that the Double Jeopardy Clause incorporates the doctrine of collateral estoppel only where the collateral estoppel, if applied, would bar a prosecution in its entirety; where collateral estoppel merely would restrict the Government's proof, *Head* holds, then it does not carry the force of the Double Jeopardy Clause. 697 F.2d at 1205. This rationale is appealing, because the Double Jeopardy Clause is most concerned with jeopardy and trials. Merely restricting the Government's proof does nothing to change the number of times a defendant is placed in jeopardy or the number of trials he must face. Since Reimnitz's claim goes only to the admissibility of his inculpatory statement and not to the constitutionality of retrial itself, his claim does not arise under the Double Jeopardy Clause, according to *Head's* analysis.[7] As it happens, though, the Court of Appeals for this Circuit recently .1as proceeded under the Double Jeopardy Clause in assessing a claim of collateral estoppel which merely would have restricted the prosecution's proof, rather than barring prosecution in its entirety. *Feela v. Israel*, 727 F.2d 151 (7th Cir.1984).[8] Assuming

6. Because federal criminal law recognized the doctrine of collateral estoppel, there was little reason for federal courts to consider whether application of collateral estoppel was mandated by the Double Jeopardy Clause. This question became important after the Supreme Court held that the Double Jeopardy Clause is binding on the States, by incorporation into the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

7. As noted above, Reimnitz asserts that the evidence apart from his inculpatory statement is insufficient to support a conviction. This assertion is immaterial. The court has no way of knowing what evidence the State has at its disposal. The court is not permitted to assume that the State introduced all its evidence at Reimnitz's first trial; this is implicit in the hold-

ing of *Tranowski*, 702 F.2d 668. The court therefore must treat Reimnitz's claim as going only to the admissibility of his statement.

8. The collateral estoppel claimed in *Feela* did not bar prosecution entirely, as demonstrated by the Court's order that the district court stay execution of the writs of habeas corpus, conditioned on retrial within ninety days. 727 F.2d at 159. Neither the Court of Appeals nor the district court cited *Mock, Powell, Head,* or any of the cases following them. The district court did cite and reject a similar distinction between collateral estoppel precluding evidentiary facts and collateral estoppel precluding ultimate facts. *Sabin v. Israel*, 554 F.Supp. 390, 391 (E.D.Wis.1983), *citing United States v. Kills Plenty*, 466 F.2d 240 (8th Cir.1972), *cert. denied*, 410

that the Court of Appeals will follow this aspect of *Feela* in the future, resort to the *Head* analysis is foreclosed.

The Court in *Mock* took a different approach, which can be applied in the present case even if, under *Feela*, Reimnitz's claim might be deemed to arise under the Double Jeopardy Clause. The Court in *Mock* assumed that the Double Jeopardy Clause is implicated by a collateral estoppel claim which merely would restrict the Government's proof, but the Court limited the immediate-appeal rule of *Abney* to those collateral estoppel claims that would bar prosecution entirely. As one part of its collateral-order analysis, the Court stated:

> *Abney's* final factor is whether an important right will be lost irreparably if review must await final judgment. Important to the *Abney* Court's affirmative answer to this query was that "[t]he prohibition [double jeopardy] is not against being twice punished, but against being twice *put* in jeopardy ...." *Price v. Georgia*, 398 U.S. 323, 326, 90 S.Ct. 1757, 1759, 26 L.Ed.2d 300 (1970) (emphasis in original). Collateral estoppel being an offshoot of double jeopardy, it must be admitted that their protective purposes are similar.... Where, however, collateral estoppel is being asserted only as a basis upon which to suppress evidence, it does not protect the defendant from being "put to risk;" the prosecution is not aborted, and he is protected only insofar as he does not have to relitigate factual issues on which he has already prevailed. Whether or not a defendant prevails on appeal, he must return to the district court for trial. Although we do not mean to minimize the importance of this protection for criminal defendants, it is not so pressing as to warrant the serious degree of intrusion into the trial process which would necessarily result from immediate appeals. While the courts have decided that the intrusion is warranted when the defendant asserts the right not to be brought to trial, in this context, the game is not worth the candle.

604 F.2d at 340.

The *Mock* Court was considering immediate appealability under the collateral-order rule in a federal criminal proceeding, while Reimnitz is a defendant in a state court seeking pre-trial habeas corpus relief. The *Mock* Court's analysis thus is not strictly applicable to Reimnitz's situation, but its relevance is apparent. Even if Reimnitz's claim regarding his inculpatory statement does involve some right which cannot be vindicated fully unless reviewed pre-trial (rendering his custody "in violation of the Constitution ... of the United States" for purposes of 28 U.S.C. §§ 2241(c)(3) and 2254(a) if his claim is valid), he still is not entitled to pre-trial habeas relief, despite the possibility of some irreparable infringement of his rights. If the intrusiveness of an interlocutory appeal in a federal criminal proceedings outweighs the importance of vindicating the double jeopardy right asserted, as held in *Mock*, then *a fortiori* the intrusiveness of federal habeas corpus review in state court criminal proceedings outweighs the importance of full vindication of that right.

The court believes that applying *Mock's* collateral-order analysis in the habeas corpus context is fully consistent with the thinking of the Court of Appeals for this Circuit, which stated, in denying pre-trial

---

U.S. 916, 93 S.Ct. 971, 35 L.Ed.2d 278 (1973). Neither the Court of Appeals nor the district court (nor the *Kills Plenty* case) was concerned at all with the question of interlocutory review of collateral estoppel rulings. The petitioners in *Feela* already had been convicted. The importance of considering the collateral estoppel claims under the Double Jeopardy Clause was that without some basis in the Constitution, the collateral estoppel claims would not have merited federal review at all. This court notes that

federal review of such claims can be supported, without raising the possibility of a right to interlocutory review, by recognizing a collateral estoppel component to the Due Process Clause, as was done (for different reasons) in *United States ex rel. DiGiangiemo v. Regan*, 528 F.2d 1262 (2d Cir.1975), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976). *See also United States ex rel. Fulton v. Franzen*, 659 F.2d 741, 744 (7th Cir.1981), *cert. denied*, 455 U.S. 1023, 102 S.Ct. 1722, 72 L.Ed.2d 142 (1982).

habeas corpus relief to another state court double jeopardy claimant:

> [T]he issue on this appeal is not rights. It is remedies—how many shall be provided for their vindication and specifically whether the extraordinary remedy of pretrial habeas corpus shall be available.

*United States ex rel. Stevens v. Circuit Court of Milwaukee County,* 675 F.2d 946, 948 (7th Cir.1982). The petitioner in *Stevens* based his double jeopardy claim on a previous guilty plea, so the impending trial would be only his first trial, not his second. The Court relied on *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), in refusing to reach the merits of the petitioner's double jeopardy claim. The Court stated:

> *Younger v. Harris* teaches that federal courts should be slow to enjoin state criminal proceedings. Against this must be set the policy of effective enforcement of the rights conferred by the double jeopardy clause. We think the *Younger* policy is the weightier when the defendant is not being asked to undergo a second trial. This conclusion does not leave the defendant without remedy. Stevens had available to him, and invoked, pretrial remedies in the state courts, which rejected his double jeopardy argument after considering it on the merits. We do not think he was entitled to more—a federal collateral remedy doubly extraordinary because sought in advance of his state criminal trial.

675 F.2d at 949.

A similar analysis yields similar results in this case. Reimnitz has had his claim rejected on the merits on an interlocutory review by the Illinois Appellate Court. He can raise his claim on direct appeal, should he be convicted again, and, if the *Feela* case gives him a collateral estoppel claim under the Double Jeopardy Clause, he can raise that claim in a post-conviction habeas corpus petition, as was done by the petitioners in *Feela.* Of course, to the extent Reimnitz's claim really is based on the asserted involuntariness of his statement, he can pursue that claim in its own name, should he be convicted. Most important, Reimnitz's claim—whether or not it is based on collateral estoppel—goes only to the admissibility of certain evidence, and not to the question of whether he can be retried at all. Review on the merits was denied in *Stevens* because Stevens was facing only his first trial. Reimnitz is facing a second trial, but he would face a second trial even if this court did hold that his statement should be suppressed. The court will not speculate as to whether the State would drop its prosecution if it could not use Reimnitz's statement. Reimnitz's claim therefore is like Stevens' claim: even if successful, it would not save him from facing a second trial. While Reimnitz's claim may carry the force of the Double Jeopardy Clause, the balance still weighs heavily against pre-trial habeas corpus relief.

## IV.

Accordingly, the court grants respondent's motion to dismiss Reimnitz's petition for a writ of habeas corpus. Additionally, the court denies as moot Reimnitz's pending motion to reconsider the court's order of January 17, 1984, dismissing the Circuit Court of Cook County as a respondent.

It is so ordered.