Douglas J. FEELA, Petitioner-Appellant,

v.

Thomas ISRAEL and Bronson LaFollette, Respondents-Appellees.

Maurice SABIN, Petitioner-Appellant,

v.

Thomas ISRAEL and Bronson LaFollette, Respondents-Appellees.

Nos. 83–2050, 83–1338.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1983.

Decided Feb. 3, 1984.

As Amended Feb. 7, 1984.

Michael Yovovich, First Asst. State Public Defender, Madison, Wis., for petitioner-appellant.

Kirbie Knutson, Asst. Atty. Gen., Wis. Dept. of Justice, Madison, Wis., for respondents-appellees.

Before PELL and CUDAHY, Circuit Judges and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

In these two cases, consolidated on appeal, petitioners-appellants Maurice Sabin and Douglas Feela appeal the denials of their respective writs of habeas corpus. The issues presented for our review are:

    I.  Whether the district court erred in finding that the introduction of van

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

theft evidence constituted harmless error;

II. Whether the state's allusions to and comments upon Feela's post-arrest silence were harmless error;

III. Whether the evidence presented at trial was insufficient to establish the guilt of Maurice Sabin as a party to the crime of attempted murder?

The facts underlying the present appeal are recounted in detail in the state reporter, See State v. Feela, 101 Wis.2d 249, 304 N.W.2d 152 (Ct.App.1981). They will not be repeated here except in skeletal fashion, as necessary to understand the issues presented for appellate review.

On January 27, 1979, Gene's Bottle House, a liquor store in Wisconsin Rapids, was robbed at gun point by an armed masked man. Maurice Sabin (Sabin) and Douglas Feela (Feela) were arrested and charged with the robbery. The state's case was based upon the immunized testimony of Sabin's son, Jerry.

Jerry testified that he, his father, Douglas Feela and Dale Patchen decided to rob a bank in Bancroft, Wisconsin. Toward that end, they drove to Waupaca to steal a vehicle to use as a getaway car. After checking out several possible vehicles, they ultimately "hot-wired" and stole a van. They returned to Bancroft, drove by the bank but decided it was too crowded to rob. The bank robbery plans were abandoned for the night, and the van was parked on a back road outside of town.

The next day the men returned to the van. Feela and Patchen changed clothes and drove the van to the bank, followed by the Sabins in Sabin's car. Feela and Patchen decided the situation did not look good and, once again, the bank robbery plans were abandoned. The van was ditched outside of town, and the men retired to a nearby tavern for the afternoon, but Jerry was fatigued and laid down in the back of Sabin's car.

Jerry awakened when the others returned to the car and the group drove to Wisconsin Rapids. Jerry heard someone say "this is it" and saw Feela exit from the car with a ski mask over his face and a gun in his hand. Jerry testified that he heard someone say that Feela was out, was being chased and that he then heard a gunshot. Sabin, Patchen and Jerry abandoned Feela and drove out of town.

Numerous witnesses saw a masked, armed man rob Gene's Bottle House and flee. Several witnesses gave chase. At one point, the armed robber turned and shot at his pursuers. Ultimately, the police joined the pursuit and came upon a partially opened basement door in a nearby house. They entered the house and called out that they were police officers. They ordered whoever was in the basement to come out. Feela emerged. A subsequent search of the basement produced a vest, gloves and a handgun which witnesses identified as those used by the robber.

At trial, both Feela and Sabin presented alibi defenses. Sabin testified that he had spent the day at home except for a short period of time at a local tavern. Feela was more creative. He testified that he had been walking into town when an armed assailant stuck a gun into his back and made him take off his coat. The assailant then handed him something and ordered him to run. Feela testified that he heard a gunshot and saw snow fly up near him; that he ran and hid in a nearby basement; and that he subsequently discovered that the articles handed him by his armed assailant were the vest, gun and gloves that had been used in the robbery.

Feela and Sabin were initially tried in Waupaca County on charges of van theft and operating a motor vehicle without the owner's consent (Wis.Stat.Ann. §§ 943.20 & 943.23 (West 1982)). After a jury trial at which Jerry was the state's main witness, Sabin and Feela were acquitted on both counts.

Feela and Sabin were then tried and convicted in Wood County of masked armed robbery (Wis.Stat.Ann. §§ 943.32 & 946.62 (West 1982)), attempted first degree murder (Wis.Stat.Ann. §§ 940.01, 939.32, 946.62

& 939.05 (West 1982)) and conspiracy to commit armed robbery of the Bancroft State Bank (Wis.Stat.Ann. §§ 939.31 & 943.32 (West 1982)).

## I

Whether the district court erred in finding that the introduction of van theft evidence was harmless error?

Prior to trial, defendants Feela and Sabin moved to suppress any evidence of the Waupaca County van theft of which they had been acquitted. The trial court ruled that testimony regarding the theft of the van would be admitted, but excluded from the trial any evidence concerning that trial and resulting acquittal in Waupaca County. The Wisconsin Court of Appeals found that the evidence of the theft of the van was properly admitted at the Wood County robbery trial. 101 Wis.2d at 257–64, 304 N.W.2d 152. However, at the habeas corpus hearings, the district courts concluded that the introduction of the van theft evidence was error, but concluded that it was harmless error.

■ Since *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the doctrine of collateral estoppel has been an element of the Constitution's prohibition against double jeopardy. In *Ashe,* the petitioner was charged in separate counts with the robbery of six poker players. Defendant was tried and acquitted of the robbery of one of the participants in the poker game. Following his acquittal, the petitioner was tried and found guilty of robbery of a second participant in that same poker game. In reversing Ashe's conviction, the Supreme Court stated:

> Collateral estoppel is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

397 U.S. at 443. The Supreme Court concluded that the Fifth Amendment guarantee against double jeopardy incorporates the doctrine of collateral estoppel.

■ The district courts here properly found that it was error to introduce the van theft evidence as part of the conspiracy charge since Feela and Sabin had been acquitted of the van theft. However, the district courts concluded that "[c]onsidered in light of the entire line of evidence on the conspiracy charge ... the fact that the van was stolen ... although improperly admitted into evidence, was harmless." *Sabin v. Israel,* 554 F.Supp. 390, 395 (E.D.Wis.1983); *Feela v. Israel,* No. 82–C–670, slip op. at 3 (E.D.Wis. April 20, 1983). This Court disagrees.

A long line of Supreme Court cases affirm that where a verdict is general, and conviction under one of several alternate theories would be unconstitutional, the conviction must be set aside lest the verdict rest on an unconstitutional basis. In *Stromberg v. California,* 283 U.S. 359, 367–68, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931), the jury returned a general verdict on a count which defined the crime in three clauses. The jury was instructed that proof of any one of the three defined acts would be sufficient to convict. The Supreme Court stated:

> The verdict against the appellant was a general one. It did not specify the ground upon which it rested.... [I]t is impossible to say under which clause of the statute the conviction was obtained. If any one of these clauses, which the state court has held to be separable, was invalid, it cannot be determined upon this record that the appellant was not convicted under that clause.... It follows that instead of its being permissible to hold, with the state court, that the verdict could be sustained if any one of the clauses of the statute were found to be valid, the necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld.

283 U.S. at 367–68, 51 S.Ct. at 535. *See also Yates v. United States,* 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957) ("... we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground but not another and it is impossible to tell which ground the jury selected."); *Street v. New York,* 394 U.S. 576, 585–88, 89 S.Ct. 1354, 1362–63, 22 L.Ed.2d 572 (1969); *Leary v. United States,* 395 U.S. 6, 31–32, 89 S.Ct. 1532, 1545–1546, 23 L.Ed.2d 57 (1969); *Bachellar v. Maryland,* 397 U.S. 564, 571, 90 S.Ct. 1312, 1316, 25 L.Ed.2d 570 (1970) ("Thus, since petitioners' convictions may have rested on an unconstitutional ground, they must be set aside.") *See also United States v. Head,* 641 F.2d 174 (4th Cir.1981); *United States v. Carman,* 577 F.2d 556 (9th Cir.1978); *United States v. Natelli,* 527 F.2d 311 (2d Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *United States v. Driscoll,* 449 F.2d 894, 898 (1st Cir.1971), *cert. denied,* 405 U.S. 920, 92 S.Ct. 948, 30 L.Ed.2d 790 (1972) ("The jury returned a general verdict and since it might have disbelieved alleged overt acts numbered one and three and rested its verdict on alleged overt act numbered two, which is legally insufficient, the conspiracy conviction cannot be upheld.")

Neither the Wisconsin Court of Appeals nor the district courts seem to have addressed the issue presently before this Court: whether the petitioners' convictions may rest upon a constitutionally infirm basis. The van theft evidence was introduced at petitioners' trial as part of the conspiracy charge. The introduction of such evidence was error. *Swenson, supra.* The conspiracy instruction to the jury read in pertinent part:

> You are instructed before you can find the defendants or either of them guilty, you must be satisfied beyond a reasonable doubt that a conspiracy existed, and in addition, that an act to affect [sic] the object of the conspiracy was performed by one or more of the conspirators. Such an act must be more than mere planning and agreement. Such an act must be done, however, it need not by itself be an attempt to commit the crime or an unlawful act.

(R. at 1017.) If the jury relied upon the van theft as the act to effect the object of the conspiracy, the petitioners' convictions rest upon an unconstitutional basis. Since the verdict is general and this Court cannot determine which "act" the jury felt effected the object of the conspiracy, petitioners' convictions on the charge of conspiracy must be set aside.

The State contends this Court should apply a harmless error analysis to the van theft evidence. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Harrison v. Owen,* 682 F.2d 138, 140 (7th Cir.1982). The state brief highlights the number of possible acts which the jury could have found to be "an act to effect the object of the conspiracy" and concludes that it would not be reasonable to assume that the jury found the van theft was the necessary conspiratorial act.

This Court disagrees. The van theft was the most conspicuous act performed by Feela and Sabin to effect the object of the conspiracy. More to the point, the harmless error doctrine requires that this Court be able to declare that the error was harmless beyond a reasonable doubt. In the context of this case and in light of the general verdict, this Court cannot say beyond a reasonable doubt that the jury did not rely upon the van theft evidence to satisfy the conspiratorial act requirement. Because a substantial probability exists that petitioners' convictions for conspiracy rest upon a constitutionally inadequate basis, we hold that petitioners' conspiracy convictions must be set aside.

Petitioners also contend that the admission of the van theft evidence tainted their armed robbery and attempted murder convictions. The state contends that the introduction of the van theft evidence, as relates to the armed robbery and attempted murder charges was harmless error. This Court agrees.

The van theft played no role in the armed robbery or attempted murder nor did the van theft evidence tend to establish the elements of either crime. Additionally, the evidence against Feela was overwhelming with respect to both the armed robbery and the attempted murder charges; the evidence against Sabin was substantial. Finally, as the district court properly noted, even though the van theft evidence was inadmissible, the state could have introduced as part of the conspiracy charge that a van was to be used and abandoned after the robbery and that the van was not owned by, registered or traceable to Sabin and his cohorts. Consequently, in light of the strength of the state's case against Feela and Sabin as well as the evidence regarding the use of a van which would have been admissible in this case, this Court can say beyond a reasonable doubt that the introduction of the van theft evidence was harmless error with respect to the armed robbery and attempted murder charges.

## II

Whether the State's allusions to and comments on Feela's post-arrest silence were harmless error?

■ Feela contends that the state, during the course of his trial, impermissibly elicited that he failed to provide the police with his alibi at the time of his arrest. Feela also argues that the prosecutor impermissibly commented on his post-arrest silence during closing arguments. The testimony Feela objects to is as follows:

Q  Mr. Feela, when you were picked up, did you indicate what had happened to your parka?

A  When I was picked up?

Q  Right, by the police.

A  What do you mean, who did I indicate it to?

Q  Did you indicate it to anybody?

A  I can't say for sure if I did or didn't. I mean I said, I said a couple of things that, the fact of being shot at, something was taken from me; I

don't know if I said my coat was or not. I don't know.

. . . .

Q  So you never saw him again?

A  Whoever it was, no. If I had known somebody I was supposed to be looking for, maybe I would have known—I would have seen him.

Q  This is the first time you have indicated this to Wood County Authorities, is that correct?

A  What are you talking about?

Q  This whole, from the point on that somebody put something in your arms, that you had put the gun in a bag, that you put some other stuff and you didn't know what it was, you put it in something; that's the first time, is that right?

A  If I can recall, yes, because when I made another statement, nobody believed me so—

Q  How much of the statement did you give?

A  To the fact that I was shot at; and nobody asked me who shot at me; nobody asked me—they just hauled me off in front of a bunch of cops and away I went.

Q  And you didn't say anything more?

A  I didn't really have much choice to say anything.

Q  Didn't they want to ask you some questions?

A  Later on that evening. See, I think it was Jere Gardner by that time; I didn't know who he was. I have met him a few times since then, and I think a guy by the name of Moen, another police officer, I think that's who was there, I'm not positive.

Q  But you didn't tell this to them?

A  No, because they made kind of wise remarks why wasn't I cold walking down here in my shirtsleeves. Just the way of their attitude, the way they were talking; I said I wanted a lawyer or legal advice, whatever, I said.

Q You hadn't told them you lost your parka, had you?

A I can't recall.

The prosecutor's closing arguments to which Feela objects were:

Now Mr. Gardner testifies that they asked him how he got there, and he said he was hitchhiking; and he said the shirt sleeves—and then suddenly, we don't hear this story. We are not told of all of this; that I have got alibi witnesses; that I have got no reason to fear because a mysterious man put this stuff in my arms, and I was forced to carry it over there.

We never heard that until today or—

MR. ZAPPEN: Objection, Your Honor.

THE COURT: Objection is sustained.

The Wisconsin Court of Appeals found that these comments and line of questioning denied Feela due process of law but held that in the context of the entire case, the comments were harmless.[1] The district court affirmed, likewise finding the error was harmless. We agree.

In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held that it is a violation of due process to impeach a defendant by asking about or commenting upon his post-arrest silence *following Miranda warnings.* The Court reasoned that *Miranda* warnings imply that "... silence will carry no penalty." *Id.* at 618, 96 S.Ct. at 2245. In the absence of *Miranda* warnings, however, the state does not impliedly assure that a defendant's post-arrest silence will not be used for impeachment purposes. In *Fletcher v. Weir,* 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1983), the Supreme Court recently declared:

In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process for a State to permit cross-examination as to postarrest silence

when a defendant chooses to take the stand.

In Feela's case, the record reflects that he was read his *Miranda* rights at the police station, not at the time he emerged from the basement. *See* R. at 438. Consequently, since Feela had not received assurances that his silence would not be used against him, his post-arrest, pre-*Miranda* silence was fair game. To the extent that the prosecutor's cross-examination focused on such pre-*Miranda* silence, the questioning was proper.

Some of the prosecutor's questioning, however, focused on Feela's post-*Miranda* silence. This was clearly improper under *Doyle, supra.* In analyzing the impact of this line of questioning, as well as the prosecutor's improper closing arguments, we are mindful that improper comments which might seem prejudicial when considered in isolation, may be harmless error when considered in context. *United States v. Forrest,* 620 F.2d 446, 455–56 (5th Cir.1980).

■ Several factors convince this Court that the prosecutor's line of questioning and closing arguments, while improper under *Doyle,* were harmless error. The comments were made in the context of a strong, indeed overwhelming, case against Feela. The comments were infrequent. The Judge instructed the jury to disregard the prosecutor's improper closing comments. As such, this Court concludes that the prosecutor's improper questioning and comments were, beyond a reasonable doubt, harmless error.

### III

Whether the evidence adduced at trial was insufficient to establish the guilt of Sabin as a party to the crime of attempted murder?

■ Under Wisconsin law, criminal liability is imposed on three types of criminal participants: principals, aiders and abet-

1. Feela also objects to a third line of questioning by the prosecutor. *See State v. Feela,* 101 Wis.2d 249, 265–66 n. 5, 304 N.W.2d 152 (1981). Both the Wisconsin Court of Appeals and the District Court found this line of questioning proper. We agree for the reasons stated in both opinions and need not address the issue further.

tors, and conspirators. Wis.Stat.Ann. § 939.05 (West 1982). The Wisconsin Supreme Court has interpreted § 939.05 as allowing both aiders and abettors, and conspirators to be convicted of crimes which were the natural and probable consequence of the intended crime. *See State v. Cydzik,* 60 Wis.2d 683, 211 N.W.2d 421 (1973); *State v. Asfoor,* 75 Wis.2d 411, 249 N.W.2d 529 (1977); *State v. Balistreri,* 106 Wis.2d 741, 317 N.W.2d 493 (1982).

■ At Sabin's trial, the trial court gave an instruction on aiding and abetting but failed to give a "natural and probable consequences" instruction. Sabin contends that the evidence presented at trial is inadequate to sustain his conviction of attempted murder on grounds of aiding and abetting. Sabin concludes that since a natural and probable consequences jury instruction was not given at his trial, his conviction for attempted murder must be reversed. We disagree.

Based on the facts of this case, Sabin's argument is a bit too syllogistic. As the district court noted:

> It is, of course, out of the latter proposition—standing ready to aid and abet—that the law regarding the natural and probable consequences flows. From the evidence as presented at trial, the jury could have concluded that Sabin was actually standing ready to aid and abet.

554 F.Supp. at 395.

It was error not to instruct the jury on the natural and probable consequences. *Asfoor, supra* at 538. "Under the circumstances, however, we think there was no possibility that had a proper instruction been given the result of the trial would have been different." *Id.* Sabin's conviction for attempted murder is totally consonant with Wisconsin case law, common sense and the facts of this case. In *State v. Cydzik,* 60 Wis.2d 683, 211 N.W.2d 421, 429–30 (1973), the Wisconsin Supreme Court stated:

> ... That is to say that defendant intended to participate in armed robbery, but did not intend to aid or assist in the murder that occurred during the robbery.

In a limited and literal concept of intending, that may describe what the lookout or driver of a getaway car has in mind when he sets out to aid and abet the armed holdup of a bank. He does not have in mind the murder of a security guard or bank customer. He has in mind a robbery and his sharing, as the defendant did here, in the proceeds of the robbery. Certainly the driver of the getaway car in a case before this court, convicted as a party to the crime under the conspiracy subsection of the party-to-a-crime statute, set out to rob a service station, not to kill the attendant in charge. But legal intent may be inferred from conduct. *One is presumed to intend natural and probable consequences of his act. Given two armed robbers, holding up a supper club or service station, it is entirely reasonable to infer on the part of each an intention to assist the other in the event that there is a shooting or killing as well as an intention to assist the other in the emptying of the cash register.* As the rule has been stated, "... the mere intention to assist, should it become necessary, if there is preconcert between accused and the perpetrator, or if the latter has knowledge of such presence and intent, will constitute an aiding and abetting."

(emphasis supplied) *Accord Asfoor, supra* at 537 ("... one who intentionally aids and abets the commission of a crime is responsible not only for the intended crime, if it is in fact committed, but as well for other crimes which are committed as a natural and probable consequence of the intended criminal acts.") If the attempted murder of Flick is not a natural and probable consequence of the armed robbery of Gene's Bottle House, it is difficult to imagine what would be. While the trial court erred in failing to deliver a natural and probable consequences instruction, this Court can say beyond a reasonable doubt that had such an instruction been provided, the result would be the same. The error was harmless.

*Conclusion*

For the reasons enumerated above, we AFFIRM the district courts' determinations

on Issues II and III. Judgment will be entered granting the writs of habeas corpus on petitioners' convictions of conspiracy but staying execution of the writs on condition that the State of Wisconsin grant petitioners a new trial on the charges resulting in their convictions within a reasonable time not to exceed ninety days, and diligently and without delay prosecute the charges to final conclusion.

AFFIRMED in part, REVERSED and REMANDED in part.