**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William K. McKINNEY, also known
as Puppet, Defendant–Appellant.**

No. 90–1171.

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1991.

Decided Jan. 22, 1992.

Rehearing and Rehearing En Banc
Denied May 1, 1992.

See also 831 F.2d 728.

472

Richard H. Lloyd, Asst. U.S. Atty. (argued), Office of U.S. Atty., Criminal Div., Fairview Heights, Ill., for plaintiff-appellee.

William Hardy (argued), Hinshaw & Culbertson, Springfield, Ill., for defendant-appellant.

Before COFFEY, RIPPLE and MANION, Circuit Judges.

MANION, Circuit Judge.

William "Puppet" McKinney appeals his conviction for conspiring to commit murder. We affirm.

I.

In 1983, William McKinney was an inmate at the United States Penitentiary at Marion, Illinois. McKinney was also a

member of the Aryan Brotherhood, a rather notorious prison gang. See, e.g., *United States v. Fountain*, 840 F.2d 509 (7th Cir. 1988), *Gometz v. Henman*, 807 F.2d 113 (7th Cir.1986), and *United States v. Silverstein*, 732 F.2d 1338 (7th Cir.1984), all detailing the exploits of various members of the Aryan Brotherhood. The Aryan Brotherhood began in the 1960's in the California prison system as a means of protecting white inmates from other prison gangs. Through the years, however, the group expanded into the federal prison system and became less interested in protection than in more profitable activities such as drug dealing and extortion, activities frequently pursued by violent means.

Gregory "Buzzard" Keefer was also an inmate at Marion. Keefer lived in the same cell unit and range as McKinney.[1] Keefer was not an Aryan Brotherhood member. However, Keefer associated with Aryan Brotherhood members, and performed tasks for the members such as making knives and assisting them in their drug dealing. Despite McKinney's Aryan Brotherhood membership and Keefer's close association with the group, relations between McKinney and Keefer were (to put it mildly) not good; indeed, according to several government witnesses, McKinney hated Keefer. According to the testimony of government witnesses, this animosity developed from several incidents between the two. Inmate Ernest Barcomb testified that on one occasion, he saw another inmate attempt to throw a sock filled with balloons of marijuana out of a cell block window to McKinney, who was in the prison recreation yard during his unit's recreation period. The throw was misguided, the sock ended up behind a fence, and McKinney was unable to retrieve it with his hands. McKinney tried to retrieve the sock with a stick but abandoned the effort when his unit was called to go inside. But Keefer, who was with McKinney, tried to retrieve the sock and was caught by two prison staff members. The staff members confiscated the marijuana.

Other events also contributed to McKinney's enmity toward Keefer. McKinney was upset by an incident in which a black inmate had "disrespected" Keefer by refusing to pay him money he owed for drugs. One inmate testified that disrespect was an event punishable by death at Marion; the disrespect reflected not only on Keefer but also on the Aryan Brotherhood because of Keefer's association with the group. McKinney was also upset when Keefer sold McKinney's knife to a member of the Mexican Mafia (another prison gang allied with the Aryan Brotherhood) in exchange for drugs. Both McKinney and Barry Mills, the Aryan Brotherhood's acknowledged leader, previously had told Keefer not to engage in such transactions. Keefer had also stolen or misplaced drugs belonging to the Aryan Brotherhood.

Keefer's behavior did not anger just Aryan Brotherhood members. Frank Mercado, a Mexican Mafia member, testified that in June or July 1983, Keefer refused to pay him for heroin he had supplied. Mercado, who would be held responsible for the payment by the Mexican Mafia, went to Mills to complain about what Keefer had done. Mercado wanted to kill Keefer; Mills told him to forget about it because there was already a "hit on Buzzard."

Around late September, after learning about the incident with the knife and about some missing drugs, Mills authorized McKinney, who had wanted to kill Keefer for some time, to go ahead. McKinney recruited two other inmates, Stanley Pearson and Robert "Pigpen" Martin, who both lived in McKinney's and Keefer's unit and range, to assist him. Pearson was a young Aryan Brotherhood member who had joined, he testified, after being pressured by other inmates. When first approached by McKinney to assist him, Pearson was not enthused about becoming involved and wanted to talk to Mills first. Pearson testified that several days or so before the actual murder he met with Mills in the prison's recreation yard. Mills told Pear-

---

1. Marion has five general housing units for inmates. Each unit is a two-story structure with cells on each floor. Each group of cells is referred to as a range. Each unit has four ranges, two on the first floor and two on the second.

son that he should help McKinney murder Keefer. Mills was persistent, and Pearson finally agreed to help McKinney.

On the evening of September 23, McKinney, Pearson, and Martin carried out their plan to kill Keefer. According to Pearson, he and Martin entered Keefer's cell as if to visit. When Keefer became relaxed, Pearson and Martin grabbed Keefer, pinned him to his bed, and signalled McKinney to enter the cell. McKinney, armed with a knife, entered and began stabbing Keefer repeatedly in the chest, neck, and head. In his frenzy, McKinney accidentally stabbed Martin. McKinney rolled Keefer over and stabbed him in the back until he stopped moving. After the killing was completed, McKinney, Pearson, and Martin spent several minutes cleaning Keefer's cell and wiping blood off the wall. McKinney then laid Keefer's body on its side in the bed and covered it with a blanket up to the neck to make it appear as if Keefer was sleeping. McKinney and Pearson hid their knives behind a fluorescent light.

Martin went to another inmate to have his stab wound stitched up. The stitches did not hold, however, and at around 8:00 that evening Martin told a guard that he had been hurt. This alerted the guards, and they began to check the cells in Keefer's block. When the guards arrived at Keefer's cell and he did not respond, they entered the cell and found Keefer dead in his bed.

The next day, Mills and another inmate, Larry Vaughn (both of whom lived in a different unit from McKinney) walked near McKinney's unit to talk to McKinney through a window in his unit. McKinney told them that he "took care of business." He also told them that Martin had been stabbed accidentally and that Pearson "did good." Pearson came by the window and Mills asked him how he was. Pearson told Mills he was "okay."

Several inmate witnesses testified about admissions McKinney had made to them. Norman Scott, an Aryan Brotherhood associate, testified that McKinney told him he had killed Keefer over a marijuana dispute and because Keefer had been disrespected.

McKinney also told Scott about the details of the murder. Ronnie Joe Chriswell, another Aryan Brotherhood associate, testified that McKinney told him he had killed Keefer because Keefer had stolen drugs. Gerald Ben Ulmer testified that McKinney had admitted killing Keefer because Keefer had stolen drugs and sold knives for drugs.

Keefer's murder resulted in a grand jury returning a two-count indictment. Count 1 charged McKinney and Mills with conspiracy to murder Keefer. (The count named Pearson and Martin as unindicted coconspirators.) Count 2 charged McKinney with Keefer's murder. Mills' case was severed from McKinney's. A jury found McKinney guilty of conspiracy to murder Keefer but found him not guilty of murder.

## II.

To convict a defendant of conspiracy to commit murder, a jury must find that a conspirator committed an "overt act to effect the object of the conspiracy." 18 U.S.C. § 1117. Count 1 charged the following overt acts:

1. On or about September 16, 1983, WILLIAM K. McKINNEY asked Stanley Pearson to assist him in the murder of Gregory Keefer because Gregory Keefer had stolen drugs from the Aryan Brotherhood, and sold knives belonging to the Aryan Brotherhood.

2. On or about September 19, 1983, Stanley Pearson asked BARRY B. MILLS whether the murder of Keefer had been authorized by the Aryan Brotherhood. MILLS told Pearson it had been authorized and told Pearson to help McKINNEY commit the murder.

3. On or about September 23, 1983, WILLIAM K. McKINNEY, aided and abetted by Stanley Pearson and Robert Martin, murdered Gregory Keefer with premeditation and malice aforethought and by means of stabbing.

4. On or about September 24, 1983, BARRY B. MILLS asked WILLIAM K. McKINNEY whether the murder had been committed and how Stanley Pearson had done. WILLIAM K. McKINNEY told BARRY B. MILLS that the

murder had been committed and Stanley Pearson had done well.

The conspiracy's object was to murder Keefer. McKinney argues that the fourth overt act charged—the conversation between McKinney and Mills the day after the murder—could not have been committed to "effect the object of the conspiracy" because Keefer had already been murdered the day before and the conspiracy was therefore over when the conversation occurred. McKinney goes on to argue that we must set aside the jury's verdict because it is impossible to determine if the jury based his conviction solely on the fourth overt act or on some other overt act.

■■■ A conspiracy ends when its central criminal purpose has been accomplished. *Krulewitch v. United States*, 336 U.S. 440, 442, 69 S.Ct. 716, 717, 93 L.Ed. 790 (1949); *Grunewald v. United States*, 353 U.S. 391, 399–406, 77 S.Ct. 963, 971–75, 1 L.Ed.2d 931 (1957); *United States v. Silverstein*, 737 F.2d 864, 867 (10th Cir. 1984). Generally, a conspiracy to commit murder ends when the murder has been committed. See *Silverstein*, 737 F.2d at 867. The government argues that the discussion with Mills after the murder was necessarily a part of the conspiracy to commit murder because the murder was done under the Aryan Brotherhood's auspices and the discussion with Mills, the Aryan Brotherhood's leader, served to inform Mills that his orders had been carried out. If the government had charged a conspiracy to run the Aryan Brotherhood as a racketeering enterprise through a series of murders, or some other conspiracy that had ends beyond Keefer's murder, the government's argument would have merit. But the government charged only a conspiracy to murder Keefer; that purpose was accomplished when McKinney, Pearson, and Martin committed the murder. The fourth overt act of the government's charge, the conversation between McKinney and Mills after Keefer was murdered, did not contribute to accomplishing the charged conspiracy's goal. Therefore it was not a valid basis for a conspiracy conviction.

■■ Usually, when a jury enters a general verdict of guilty and the verdict may have rested on an invalid ground, the appellate court will reverse the verdict because it is impossible to determine whether the verdict rested on a proper or improper ground. *Cramer v. Fahner*, 683 F.2d 1376, 1379 (7th Cir.1982); *United States v. Driscoll*, 449 F.2d 894, 898 (1st Cir.1971). But McKinney's attorney did not object to placing the fourth overt act before the jury as a basis for conviction. The government argues that because of this failure, McKinney has waived this issue and that we may reverse only if the error was plain error. See Fed.R.Crim.P. 30 (party may not raise instruction error on appeal unless he objects in district court) and 52(b) (court of appeals may notice plain errors even if not raised). McKinney counters with cases holding that placing before a jury an invalid ground for conviction can never be harmless error. E.g., *Feela v. Israel*, 727 F.2d 151, 155 (7th Cir.1984); *Cramer*, 683 F.2d at 1379–80. McKinney reasons that if the error here could not be harmless, it must automatically be plain error.

■■■ But harmless error and plain error are not the same, and the fact that an error is not harmless does not necessarily mean it is plain error. See *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984). Where an alleged error is deemed to violate the Constitution (as in this case, see *Cramer*, 683 F.2d at 1379), an error is harmless only if the appellate court can find that it was harmless beyond a reasonable doubt—that is, that no reasonable doubt exists that the error affected the jury's verdict. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Moreover, the government must demonstrate that the error was harmless; a defendant need not affirmatively show harm. Cf. *United States v. Giovannetti*, 928 F.2d 225, 226 (7th Cir. 1991) (government may waive argument that error is harmless by failing to raise it unless the error's harmlessness is obvious). Plain error, on the other hand, is an error so grievous that it caused an actual miscarriage of justice, which implies that the defendant probably would not have been con-

victed absent the error. See *United States v. Mejia,* 909 F.2d 242, 247 (7th Cir.1990). Reversal for plain error rule "is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)). This stringent standard for plain error has been applied in cases involving alleged constitutional errors. See *United States v. Burton,* 937 F.2d 324, 329–30 (7th Cir.1991); *United States v. Snyder,* 872 F.2d 1351, 1354 (7th Cir.1989); see also *United States v. O'Banion,* 943 F.2d 1422, 1432 (5th Cir. 1991).[2]

There is a reason for the difference between harmless error and plain error. If the district court, despite the defendant's objection, makes a mistake, it is appropriate to place on the government the burden of showing the error did not substantially prejudice the defendant. But "reversing a conviction based on an error that the defendant's lawyer failed to bring to the judge's attention is inconsistent with the premises of an adversary system and disruptive of the efficient operation of the criminal justice system." *Silverstein,* 732 F.2d at 1349. Placing the burden on the defendant to show that an error he failed to object to at trial probably caused an unjust conviction encourages litigants to "seek a fair and accurate trial the first time around" while allowing a defendant relief from errors that cause a miscarriage of justice. See *Young,* 470 U.S. at 15, 105 S.Ct. at 1046.

Because McKinney failed to object at trial to placing the fourth overt act before the jury, we will reverse McKinney's conviction only if that error was plain error. As we have said, an error is plain error only if absent the error McKinney probably would not have been convicted. What that means here is that presenting the fourth

overt act to the jury was plain error only if the jury probably convicted McKinney on the basis of the fourth overt act. Despite the fact that the jury acquitted McKinney on the murder count, it was unlikely that the jury would have based the conspiracy conviction only on the conversation between McKinney and Mills the day after Keefer's murder. Most of the evidence in this case, including the evidence of McKinney's and Mills' conversation, was provided by inmate witnesses whose credibility McKinney's attorney vigorously challenged. The evidence of McKinney's and Mills' conversation was not *significantly* stronger than the evidence of any other events surrounding Keefer's murder. Moreover, if the jury believed that Mills sought out McKinney to ask him how the murder had gone and how Pearson had performed, it is difficult to see how the jury would not have believed that McKinney had performed other acts to plan and execute the murder. Why would Mills ask McKinney about the murder unless McKinney was a participant in the plot?

■ This does not mean the jury necessarily found one of the overt acts charged in the indictment. But a jury may base a conspiracy conviction on proof of an overt act not charged in the indictment. *United States v. Harris,* 542 F.2d 1283, 1300 (7th Cir.1976); see also *United States v. Elizondo,* 920 F.2d 1308, 1319 (7th Cir.1990). Nothing in the jury instructions told the jury that it could convict only if it found one of the overt acts as charged in the indictment. Moreover, under 18 U.S.C. § 1117, the conspiracy statute under which McKinney was indicted, a jury may base a conviction on an overt act the defendant did not personally perform, so long as it finds the defendant actually joined the conspiracy. See 18 U.S.C. § 1117 ("If two or more persons conspire [*to commit murder*] *and one or more of such persons* do any overt act. . . .") (emphasis added); see generally 2 Wayne R. La Fave and Austin W. Scott,

---

2. This court has stated that " '[e]rrors of constitutional dimension ... are more freely noticed than are less serious, non-constitutional errors.' However, even in the case of alleged constitutional error we may reverse in the absence of an

objection in the district court only 'if we find reversal necessary to avoid a miscarriage of justice.' " *United States v. Cherry,* 938 F.2d 748, 753 n. 7 (7th Cir.1991) (quoting *United States v. Shue,* 766 F.2d 1122, 1132 (7th Cir.1985)).

Jr., *Substantive Criminal Law* § 6.15, at 94 (1986). At the very least, the jury had to have found that Keefer was murdered. While the jury might not have found that McKinney actually plunged the knife into Keefer, if it found McKinney had agreed to the murder and was a participant in the plot, the murder itself would have been a sufficient overt act on which to base a conspiracy conviction. Therefore, it is not probable that the jury convicted McKinney solely on the basis of the fourth alleged overt act. Thus, submitting that act to the jury was not plain error.

### III.

The government's trial theory was that Keefer's murder was the result of an Aryan Brotherhood conspiracy. To understand the murder, the jury had to know something of the Aryan Brotherhood's background and operations. Consequently, some of the government's evidence focused on the Aryan Brotherhood's general activities, including its evolution into a prison gang bent on drug running and extortion, and its means of controlling and disciplining its members and associates, means that included in some cases murder. While acknowledging that some evidence concerning the Aryan Brotherhood's background and operation might have been proper, McKinney argues that the district court went too far in this case by admitting evidence of other unrelated murders committed by (or presumably committed by) the Aryan Brotherhood.

Specifically, McKinney complains about testimony from several inmate witnesses. Ronnie Chriswell testified that he and John Greshner, an Aryan Brotherhood member, previously had killed an inmate for the Aryan Brotherhood, and that after the murder Greshner had put him up for membership in the Aryan Brotherhood (an offer Chriswell declined). Chriswell also stated that he and Greshner had used the Mexican Mafia when planning the killing, and that "The Aryan Brotherhood will kill for the [Mexican Mafia] and they would kill for [the Aryan Brotherhood]." The district

court sustained McKinney's objection to this last statement.

Larry Vaughn, another Aryan Brotherhood associate, testified that he was "around numerous times when people was ordered to be killed" by the Aryan Brotherhood. He also testified that he began to cooperate with the government because he was scared because "so many people [were] getting killed over there, just what the people was getting killed for.... I never been around this type of people that is over there now. Life didn't mean anything to them."

George Harp, a member of the Aryan Brotherhood since almost the time it began, testified generally about the Aryan Brotherhood's organization and objectives, and its transformation from a gang interested in protecting white inmates into a racketeering organization. Harp further testified that he began to cooperate with the government in 1983 because he "became disillusioned with all the violence and the senseless killing; I just couldn't stomach that any longer." Norman Scott, another Aryan Brotherhood associate, testified that he began cooperating with the government when the Aryan Brotherhood tried to kill him at Lompoc Prison in California.

Finally, Pearson, the government's only eyewitness, testified that he agreed to cooperate fully with the government (after lying to a grand jury when he purportedly had been cooperating in the past) because he was afraid the Aryan Brotherhood or the Mexican Mafia would kill him. Immediately after this, the prosecutor asked him what would have happened to him if he had not agreed to help kill Keefer. He replied, "I would have been killed." The district court sustained McKinney's objection to this question and answer.

McKinney makes two arguments concerning the evidence of other murders. First, he argues that the testimony about witnesses' fears of being killed by the Aryan Brotherhood (all of which the government elicited on direct examination) constituted an impermissible attempt to bolster those witnesses' credibility before their credibility had been attacked. Second,

McKinney argues that the testimony referred to the Aryan Brotherhood's propensity to commit murder. McKinney argues that evidence of this propensity created the unreasonable danger that the jury would reason: the Aryan Brotherhood commits murders; McKinney was an Aryan Brotherhood member; therefore, McKinney must have killed Keefer. Thus, McKinney argues, the evidence's potential for unfair prejudice substantially outweighed its probative value, which McKinney claims was slight. See Fed.R.Evid. 403.

■ Before getting to McKinney's specific objections, we note that the district court sustained objections to two of the pieces of testimony that McKinney now complains about: Chriswell's testimony that the Aryan Brotherhood and Mexican Mafia would kill for each other, and Pearson's testimony that he would have been killed if he had not helped kill Keefer. The district court instructed the jury to disregard evidence to which it sustained an objection, and McKinney has given no reason to suppose the jury did not follow this instruction. We normally presume that juries follow the court's instructions; that presumption is essential to the proper functioning of the trial system. See *United States v. Perez*, 870 F.2d 1222, 1227 (7th Cir.1989). Consequently, this discarded testimony gives us no reason to reverse.

■ This brings us to McKinney's specific arguments. McKinney argues that it was improper to elicit testimony about why witnesses were cooperating because it is improper to bolster a witness's credibility on direct examination before the opposing party has attacked that witness's credibility. However, McKinney did not object on this basis to any testimony at trial. Therefore, he has waived this objection unless admitting the witnesses' testimony over this objection would have been plain error. See Fed.R.Evid. 103(a)(1) and (d).

McKinney bases his improper bolstering argument on *United States v. LeFevour*, 798 F.2d 977, 983 (7th Cir.1986). In *LeFevour*, we stated that "[t]o bolster a witness's credibility in advance is improper." *Id.* We based this statement on Fed.

R.Evid. 608(a)(2), which provides that "evidence of truthful character is admissible only after the character of the witness for truthfulness is attacked...." We went on in *LeFevour*, however, to note that the evidence in that case—answers to questions about the witnesses' testifying under plea or immunity agreements—was not likely to bolster the witnesses' credibility because such agreements imputed a motive for witnesses to testify in the government's favor. "[F]ew jurors would believe that the government would retaliate against a witness because he had lied *for* the government." 798 F.2d at 983. We also observed that had the government not elicited testimony about the agreements, the defense was likely to do so on cross-examination. *Id.* After this observation, we went on to hold that the government could properly elicit testimony about the agreements on direct examination because "[a] party ought to be able to extract the complete testimony of his witnesses, including the essential circumstances bearing on its believability.... [E]ach party is entitled to place its case before the jury at one time in an orderly, measured, and balanced fashion, and thus spare the jury from having to deal with bombshells later on." *Id.* at 983–84.

In light of *LeFevour*, it would not have been plain error to admit evidence of the inmates' motive for cooperating during direct examination. Whether or not such evidence is really "evidence of truthful character" is not so obvious that it would be plainly wrong to answer "no." Moreover, as in *LeFevour*, one could doubt that the testimony here would actually bolster the witnesses' credibility; a witness under government protection and in fear for his life has a strong incentive to say what the government wants to hear, to keep that protection. It would not obviously be wrong to conclude that, as in *LeFevour*, the government's questioning was an effort "to extract the complete testimony of [its] witnesses, including the essential circumstances bearing on its believability." *Id.* at 983. And, in any event, the testimony was likely to come out anyway. McKin-

ney's counsel had to attack the inmates' credibility, and an obvious line for such attack would be to probe any deals the witnesses had with the government. The government in order to rehabilitate those witnesses would have properly elicited the testimony about its witnesses' motives.

■■■■ So we now come to McKinney's argument that the evidence of other murders violated Rule 403 because its potential for unfair prejudice substantially outweighed its probative value. Whether the potential for unfair prejudice of a given piece of evidence outweighs its probative value is a decision left to the district court's discretion. *United States v. Field,* 875 F.2d 130, 135 (7th Cir.1989). We find no abuse of discretion in this case. The government's trial theory was that Keefer's murder was the result of an Aryan Brotherhood contract. To present the complete picture of the murder and conspiracy, the government was entitled to introduce some evidence of what the Aryan Brotherhood did and how the group operated. This evidence could reasonably include evidence of the Aryan Brotherhood's racketeering (including drug dealing) and even of murders committed under its auspices. For example, evidence of how the Aryan Brotherhood controlled and disciplined its members would be relevant to show why Pearson would become involved in killing Keefer, something he apparently did not want to do. Evidence of the Aryan Brotherhood's racketeering activities would be relevant to show why McKinney and the Aryan Brotherhood would want to kill Keefer. Cf. *United States v. Silverstein,* 737 F.2d at 866. Several incidents led to the decision to kill Keefer, including his misplacement of drugs, his selling knives for drugs, and the "disrespect" shown to him by another inmate (which, because he was an Aryan Brotherhood associate, amounted to disrespect of the group). Evidence of the Aryan Brotherhood's illegal activities places these incidents in context.

Most of the testimony McKinney complains about did not involve specific killings by the Aryan Brotherhood. Instead, several witnesses testified that their general fear of being killed was the reason they decided to testify for the government. As we have noted, McKinney has waived the argument that this testimony was improperly admitted on direct examination. And, as we have indicated, the evidence would have been relevant anyway to rebut McKinney's attempts to impeach the government's witnesses by attacking their motives for testifying. Cf. *United States v. Mills,* 704 F.2d 1553, 1560 (11th Cir. 1983).

It is true that a danger existed that evidence of the Aryan Brotherhood's propensity to commit murder could unfairly smear McKinney by leading to the conclusion that since he was an Aryan Brotherhood member, he must have shared that propensity. But that danger was unavoidable. The district court was careful not to allow testimony that implicated McKinney in any other murders. McKinney argues that the district court should have given an instruction limiting the jury's use of evidence about the Aryan Brotherhood. But McKinney did not ask for a limiting instruction at trial so he cannot now complain about the lack of such an instruction. We conclude that the district court did not abuse its discretion in admitting the testimony about the Aryan Brotherhood's activities or other murders it committed.

## IV.

McKinney raises several other alleged errors. The first involves testimony by Larry Vaughn and Frank Mercado concerning co-conspirator statements that took place in June or July of 1983. Vaughn testified about a meeting between McKinney, Mills, Keefer, and several other Aryan Brotherhood members concerning the "disrespect" another inmate had given Keefer. McKinney was very angry. Mills, in what appeared to be an attempt to calm McKinney and warn Keefer, said to them, "the next time you [Keefer] take it, we're gonna take you out." Mercado testified that he spoke to Mills about a drug deal in which Keefer had refused to pay. Mercado told Mills he wanted to kill Keefer; Mills told

him to "leave it alone" because he had "already put a hit out on Buzzard."

◼ The district court admitted these statements as co-conspirator statements made in furtherance of the conspiracy to kill Keefer. See Fed.R.Evid. 801(d)(2). McKinney does not argue that there was insufficient evidence to conclude that a conspiracy existed in June or July of 1983, or to show that the statements were made to further that conspiracy. Instead, McKinney argues that proof of a conspiracy in June or July of 1983 constitutes an impermissible variance from the indictment, which charged a conspiracy "from on or about September 16, 1983, and continuing thereafter until on or about September 24, 1983."

◼ We disagree. Where the date is not an element of the crime, a variance between the date charged and the date proven does not require reversal so long as the date proven is within the statute of limitations and before the indictment date. *United States v. Leibowitz*, 857 F.2d 373, 378 (7th Cir.1988); *United States v. Alexander*, 850 F.2d 1500, 1504 (11th Cir.1988), *vacated and remanded on other grounds*, 492 U.S. 915, 109 S.Ct. 3236, 106 L.Ed.2d 584 *reinstated*, 888 F.2d 777 (11th Cir. 1989), *cert. denied*, ─── U.S. ───, 110 S.Ct. 2623, 110 L.Ed.2d 643 (1990). Requiring that the allegations in the indictment and the proof at trial correspond serves two purposes: to insure that the defendant is not subject to a second prosecution, and to give the defendant reasonable notice so that he may prepare a defense. *Alexander*, 850 F.2d at 1505. Reversing McKinney's conviction would not further these purposes. There is no possibility here that McKinney would be subject to a second prosecution for conspiring to murder Keefer. Nor has McKinney shown that the variance prejudiced him. The "on or about" designation specifically told McKinney that the indictment dates were approximate and subject to some reasonable variation. McKinney has not shown how the variance here prevented him from presenting his defense. He does not, for example, contend that he was denied discovery. Be-

cause McKinney has not shown he was prejudiced, it was not error to admit evidence of conspiratorial statements from June or July of 1983.

◼ McKinney also argues that the district court erroneously allowed Ernest Barcomb's testimony about the marijuana transaction he had observed McKinney and Keefer involved in and his testimony that after the murder McKinney had told him "hell, he had it coming and you know why." McKinney contends that the testimony about the marijuana transaction was inadmissible under Fed.R.Evid. 404(b), which provides that "[e]vidence of other crimes ... is not admissible to prove the character of a person in order to show action in conformity therewith."

While Rule 404(b) prohibits evidence of bad acts simply to show bad character, it does allow evidence of bad acts to prove such things as motive or intent. In this case, Barcomb's testimony was relevant to McKinney's motive for killing Keefer. It is true, as McKinney argues, that the marijuana transaction occurred 20 months before Keefer's murder. But this does not necessarily mean it was too remote to be relevant. McKinney's hatred of Keefer was the result of a number of incidents; that hatred, and McKinney's motive for killing Keefer, built over time. It was not unreasonable to allow the government to show early manifestations of that hatred. McKinney also argues that even if Barcomb's testimony was relevant, its potential for unfair prejudice substantially outweighed its probative value. Unfair prejudice is the likelihood that evidence of the prior bad act would convince the jury to convict for something other than the crime charged. It was not unfair to show McKinney's motive by showing that Keefer botched a drug transaction McKinney participated in; the motive for committing a crime is directly relevant to proving the crime. It is doubtful, or at least reasonable for the district court to conclude it was doubtful, that the jury would base a murder or conspiracy conviction on the marijuana transaction rather than on evidence of McKinney's participation in the conspiracy

and murder. The district court did not abuse its discretion by admitting Barcomb's testimony.

 McKinney finally raises two related arguments, both based on his trial attorney's attempt to introduce extrinsic evidence of prior inconsistent statements made by Pearson. Pearson testified that he had lied to the FBI and the grand jury about Keefer's murder because McKinney had told him to lie. McKinney's counsel wanted to present two witnesses in the defense case to testify that Pearson had admitted to them that he had lied for some other reason. But his counsel never confronted Pearson with his prior inconsistent statements on cross-examination. When she attempted to present the other two witnesses' testimony, the government objected. The court refused to allow the testimony because of Fed.R.Evid. 613(b), which states that "[e]xtrinsic evidence of a prior inconsistent statement is not admissible unless the witness is afforded an opportunity to explain or deny the same...." McKinney's attorney then asked for permission to recall Pearson to ask him about the statements; the district court refused this request.

McKinney contends that his trial attorney provided constitutionally inadequate representation by failing to lay the proper foundation to introduce Pearson's inconsistent statements. To show that he was denied his Sixth Amendment right to effective representation, McKinney must show that his attorney's performance was deficient, and that his attorney's deficient performance prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). To show prejudice, McKinney must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

McKinney's attorney admitted to the district court that essentially she just made a mistake by failing to confront Pearson with his inconsistent statements. The government argues that despite this admission, counsel's failure was really a trial tactic designed to avoid re-emphasizing that Pearson lied at McKinney's behest. We need not decide whether McKinney's attorney performed deficiently (nor could we based on the record before us). Even if McKinney's attorney's performance was deficient, McKinney did not suffer sufficient prejudice to show he was denied his right to effective assistance of counsel. Counsel extensively cross-examined Pearson, eliciting a number of reasons for Pearson to fabricate his testimony and probing the inconsistencies in his testimony. Counsel established that Pearson lied both to the grand jury and to the FBI. Most importantly, counsel presented two witnesses who testified that at the time Pearson said he spoke to Mills on the prison recreation yard about whether to help with Keefer's murder, Pearson's and Mills' units were not allowed to recreate together. This testimony was potentially devastating to Pearson's credibility. Given all this, McKinney has not established a reasonable probability that but for his attorney's alleged mistake in not confronting Pearson with his other inconsistent statements, the outcome of his trial would have been different.

 McKinney also argues that the district court abused its discretion in not allowing him to recall Pearson. However, McKinney had sufficient opportunity to confront Pearson with his statements on cross-examination. Moreover, McKinney's attorney asked to recall Pearson five days after he originally testified. Pearson was a member of the witness security program, and transporting him back to court would have been difficult and time-consuming. Besides, counsel's cross-examination of Pearson had otherwise been thorough and effective. Under these circumstances, the district court did not abuse its discretion by refusing to allow McKinney to recall Pearson.

For the reasons stated above, McKinney's conviction is

AFFIRMED.